IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA
CIVIL CIRCUIT

FILED
MAY - 2 2000
Date Time
CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

**GLORIA CHASE**, individually and
as Personal Representative of the Estate of
Philip Chase, deceased,

PLAINTIFFS,

v.

CASE NO: 99-008437-CI-007
8:00-cv-853-T-24E

**THE SCHOOL BOARD OF PINELLAS COUNTY, FLORIDA, J. HOWARD HINESLEY**, individually and in his official capacity as Superintendent of Pinellas County School System, **JAMES BARKER**, individually and in his official capacity as Head of the Pinellas County School Office of Professional Standards, **ROBERT BAKER**, individually and in his official capacity as Assistant Principal Sandy Lane Elementary School, Pinellas County, Florida, **JUDY FAY**, individually and in her official capacity as teacher union representative in the Pinellas Classroom Teachers Association, **DAVID MORROW, THE PINELLAS CLASSROOM TEACHERS ASSOCIATION, FLORIDA TEACHING PROFESSION /NATIONAL EDUCATION ASSOCIATION, JADE MOORE**, Executive Director, Pinellas Classroom Teachers Association,

DEFENDANTS.

00 APR 12 AM 10: 17
FILED

**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Gloria Chase, individually and as the Personal Representative of the Plaintiff, Philip Chase ("Chase"), deceased, hereby sues the School Board of Pinellas County, J. Howard Hinesley, James Barker, Robert Baker, Judy Fay, David Morrow, the Pinellas Classroom Teachers Association, Florida Teaching Profession, the National Education

Association, and Jade Moore and says unto the Court the following:

**JURISDICTION AND PARTIES**

1. This is an action for damages which exceed fifteen thousand dollars ($15,000) exclusive of interest, costs and attorney's fees.

2. This is an action brought by Gloria Chase, individually and as Personal Representative of the Estate of Philip Chase, as a survival action, pursuant to Section 46.021 Florida Statutes.

3. This action is brought pursuant to the Florida Tort Claims Act, Section 768.28 of the Florida Statutes; 42 U.S.C. § 1983 and other applicable Florida law.

4. At all material times, the decedent, Philip Chase (hereinafter "Chase") was a citizen of the United States and resident of Pinellas County, Florida.

5. Gloria Chase is the Personal Representative of the Estate of Philip Chase, deceased. A copy of a "Letter of Administration" issued to Gloria Chase by the Circuit Court in and for Pinellas County, Florida is attached hereto as Exhibit "A". At all relevant times Gloria Chase was the spouse of Phillip Chase.

6. Pursuant to § 768.28 of the Florida Statutes, a NOTICE OF CLAIM for the injuries and claims described in this Complaint was provided to the necessary Defendants and the Florida Insurance Commissioner.

7. Defendant, the School Board of Pinellas County (hereinafter "School Board") is a political subdivision of the State of Florida.

8. At all material times, Defendant J. Howard Hinesley (hereinafter "Hinesley") was employed as the Superintendent of the Pinellas County, Florida school system. As such,

Hinesley was responsible for the formulation of policy and direction of subordinates within the school system acting under color of state law.

9. At all material times, Defendant James Barker (hereinafter "Barker") was employed as the head of the Pinellas County School Office of Professional Standards and as such was responsible for the formulation of policy and direction of subordinates within the Pinellas County school system acting under color of state law.

10. At all material times, Defendant David Morrow (hereinafter "Morrow") was the Principal of Sandy Lane Elementary School, Pinellas County, Florida and as such was responsible for the formulation of policy and direction of subordinates within Sandy Lane Elementary School acting under color of state law.

11. At all material times, Defendant Robert Baker (hereinafter "Baker") was the Assistant Principal of Sandy Lane Elementary School, Pinellas County, Florida and as such was responsible for the formulation of policy and direction of subordinates within Sandy Lane Elementary School acting under color of state law.

12. Plaintiff, is of information and belief that Defendant Pinellas Classroom Teachers Association (hereinafter "PCTA") is a Florida Corporation having its principle address as 650 Seminole Boulevard, Largo, Florida 33770-3625. PCTA is a local of the national labor organization, National Education Association ("NEA"). The Florida Teaching Profession ("FTP") is the state local intermediary of the NEA for the State of Florida.

13. Chase, at all relevant times was a member of the PCTA, FTP and NEA.

14. The PCTA, FTA and NEA (hereinafter referred to collectively as "the Union") hold themselves out to their members and the public as being a labor union for teachers, the

function and purpose of which is to at all times act in the best interests and welfare of its individual members through its representation of such members in the collective bargaining process, all grievance proceedings, all disciplinary proceedings and all matters relating to the individual members' employment.

15. At all material times, Defendant Jade Moore (hereinafter "Moore") was a resident of the State of Florida and Executive Director of the PCTA.

16. At all material times, Defendant Judy Fay (hereinafter "Fay") was a resident of Florida, a teacher at Sandy Lane Elementary School and a union representative acting by, with and through the PCTA to represent Sandy Lane Elementary School teachers, including Chase.

17. At all material times, Defendants Baker, Hinesley and Barker, acted under color and pretense of the laws of the State of Florida, as well as the policies, and common practices of the School Board.

18. All acts material to this action occurred in Pinellas County, Florida.

## FACTS COMMON TO ONE OR MORE COUNTS

19. Philip Chase, born April 28, 1948, earned a Bachelor of Science Degree in Health and Physical Education from Northeast Louisiana University in 1971.

20. In 1971, Chase commenced his service as a teacher with distinction in the Tampa Bay area public schools. In 1976, Chase began teaching in Pinellas County.

21. Chase earned a Master of Education Degree from the University of Richmond in 1980.

22. For the majority of his twenty four year teaching career Chase taught at Dunedin

High School, Pinellas County. Chase taught at Dunedin High School through to the end of the 1991 school year, serving as both a Physical Education teacher and wrestling coach. During such period, Chase's annual performance evaluations routinely acknowledged Chase's professional competence and skill in the field of physical education.

23. In 1991, Chase, due to state budgetary reductions, was reassigned, to teach at Cypress Woods Elementary School.

24. Chase taught at Cypress Woods from 1991 to the end of the 1993/1994 school year. Chase's annual performance evaluations while at Cypress Woods were each rated at meeting or exceeding standards.

25. At no time during the period of 1971 through to the end of the 1993/1994 school year were Chase's skills and/or competence as a teacher ever questioned by any supervisor or school administrator.

26. In September 1994, Chase requested and received a voluntarily transfer to Sandy Lane Elementary School so that he could be closer to his home and family.

27. Defendant Fay was a teacher at Sandy Lane Elementary School. She contemporaneously held the position of Faculty Representative to the PCTA, and was a member of the PCTA Executive Board.

28. Defendant Fay's husband had unsuccessfully applied for the same teaching position at Sandy Lane Elementary School which was ultimately awarded to Chase.

29. Beginning in August, 1994, immediately upon Chase's arrival at Sandy Lane Elementary School, Chase encountered an exceedingly hostile, abusive and unjustifiably contentious Fay.

30. Fay, apparently as a result of her personal animosity towards Chase for his having received the teaching position which Fay desired for her husband, began a campaign of harassment which was purposely intended to result in Chase's termination and the destruction of Chase's career and livelihood.

31. Pursuant to this campaign, Fay, *inter alia*, filed in excess of seventy two (72) false and baseless complaints of personal and professional misconduct against Chase over the following two year period. Fay's allegations of misconduct included, *inter alia,* that Chase had not closed a shed door; that Chase required children in his physical education class to do additional exercises as "punishment"; and that Chase was "loud." Fay also falsely asserted, *inter alia*, that Chase physically jerked a child to the ground to make the student sit; and that Chase "embarrassed" a child when he sent the child to a "time out" for violation of school rules.

32. Pursuant to her campaign to have Chase wrongfully terminated, Fay submitted her false allegations to Assistant School Principal Baker and School Principal Morrow. Fay, in violation of established policy, also bypassed local school administrators and complained directly to county level school administrators concerning Chase.

33. Defendant Fay pursuant to her campaign to have Chase wrongfully terminated, abused her position as Union representative for Sandy Lane Elementary and wielded her influence in the PCTA to enlist the other Defendants, named herein, to assist her in achieving her objective.

34. Fay and the other defendants' specific conduct includes but is not limited to the following:

35. On or about September 8, 1994, Fay falsely advised Defendant Baker that Chase had threatened a student by saying, "[i]f you do one more thing I will slap your face off." When advised of the allegation, Chase adamantly denied that any such incident had occurred. Chase also specifically requested that Baker and/or the school administration investigate the matter to prove the falsity of the allegation. Neither Baker nor any other School Board employee, ever made any efforts to investigate the allegation.

36. Notwithstanding, Baker, on September 12, 1994, issued a formal Letter of Reprimand admonishing Chase for such alleged and unsubstantiated conduct.

37. On September 13, 1994, Baker faxed a Complaint Report containing the allegations to the Pinellas County School Office of Professional Standards. The Complaint Report falsely cited Baker as the source of the complaint.

38. On or about September 14, 1994, Fay wrote a letter "To Whom It May Concern" asserting that, *inter alia*, she "thought" she heard Chase say to a student, "I'm talking to you 4 eyes" and that Chase "yelled" at students. Defendant Fay also complained that Chase, after having reprimanded a disruptive student, gave the student a "high five."

39. Defendant Morrow, on September 15, 1994, in response to Chase's asserted belief that Baker was acting in concert with Fay in an effort to have Chase wrongfully terminated, assured Chase that Baker would have no subsequent involvement regarding any issues affecting Chase.

40. On or about September 20, 1994, Fay complained to Substitute Assistant Kline, that Chase's advice to her that in the future she should consider restraining an exceptionally disruptive student, was improper and contrary to the law. Defendant Fay

falsely asserted "you can't restrain a student. Legally you can't touch a student." Fay's assertion was contrary to Article XIII, "Student Discipline," Section E, of the Agreement Between School Board of Pinellas County and the Pinellas County Teacher Association (the "Agreement") provides "[a] teacher may use such reasonable physical restraint as is necessary to protect the teacher from disruptive pupils, to protect other pupils from disruptive pupils and to maintain general control ...." Fay lodged an identical complaint concerning Chase with Morrow.

41. On or about September 21, 1994, Defendant Moore, Executive Director of the PCTA and Chase's union official, contacted Fay regarding Chase.

42. Moore is quoted in Fay's diary as stating "[l]et David [Morrow] do his job. He is the one to put pressure on him [Chase], not me [Fay]. He'll [Chase will] hang himself soon. It won't take long. He's [Chase's] not going to be there long. Don't get ulsers (sic) over this. You've done all you can do. Now let David [Morrow] handle it."

43. On or about September 21, 1994, Fay, in a conference with Morrow conducted without Chase being present, gave Morrow the ultimatum that either "Chase leaves" or she would. Defendant Fay also threatened that if her demands were not met to her satisfaction that she would go to Bill Williamson, Area One Superintendent of the School Board. (An act which she subsequently did on January 3, 1995.)

44. Chase, on or about September 22, 1994, sent correspondence responding to the unfounded allegations contained in Baker's September 12, 1994 Letter of Reprimand in which he specifically identified students who could rebut the false allegations. Chase's letter was highly critical of Baker for, *inter alia*, Baker's unwillingness to investigate any

of the allegations and his threats relating to Chase being close to retirement. Chase also reiterated his grave concerns regarding Defendant Fay's campaign to have him fired and Baker's manifest lack of objectiveness.

45. On or about September 26, 1994, Baker sent his September 12, 1994 Letter of Reprimand along with Chase's response to Defendant Barker, Administrator of Professional Standards. In doing so, Baker specifically requested that the Letter of Reprimand be placed in Chase's personnel file.

46. Defendant Fay on or about October 11, 1994, without right or authorization, accessed Chase's school mailbox and took private professional correspondence addressed to Chase.

47. Though Chase's lesson plans had never been called into question during his 25 year career, Fay, based on the information she unlawfully obtained from Chase's personal mailbox, irrationally asserted that Chase's lesson plans were unacceptable and demanded a meeting with Defendant Baker to address such.

48. The meeting occurred on October 17, 1994, at which time Fay also complained that Chase, despite being sick and having a sick child, came to school that morning at 7:30 a.m., drafted a lesson plan for his classes and, thereafter, went home ill. Fay lodged such complaint despite the fact that a substitute teacher had arrived prior to the beginning of any classes and that Chase exhibited exceptional responsibility by attempting to work that morning.

49. On or about October 17, 1994, Baker, again met with Fay concerning Chase. Baker's meeting with Fay was in direct contravention to Morrow's directive to Baker and

Morrow's assurance to Chase that Baker would have no further involvement in issues relating to Chase.

50. In or about January, 1995, an undated letter was sent to the school purportedly from an individual named "Nicole Krug." The letter asserted that Krug had witnessed Chase on January 17, 1994 jerk a girl student. "Krug" further stated that Chase "doesn't belong" and that she "would like him removed."

51. No investigation was conducted by Morrow or Baker to ascertain the identity of the alleged victimized student. Nor was Chase even advised of the allegation. Notwithstanding, the Plaintiffs are of information and belief that Fay, Barker, Baker and/or Morrow reported the "incident" to the office of Professional Standards Administration which, in turn, authorized a criminal investigation by the Sheriff's Department provided "Krug" could identify the student. Though "Krug" failed to appear to identify the student, this uncorroborated alleged incident was later used to justify the termination of Chase's employment.

52. Fay's diary entry for January 20, 1995, stated that a parent had complained to Morrow that her son Travis Daily had asthma; that the previous day Travis felt an attack coming on in P.E. class and stopped running after the second lap; and that Chase allegedly "yelled" at Travis to keep running which "embarrassed Travis in front of the class." The entry further stated that the parent asked Morrow to speak to Chase. Notably, Fay would not have been privy to such information unless she orchestrated the complaint or Morrow improperly disclosed such information to her.

53. On January 30, 1995, ten days after Travis Daily's mother allegedly spoke with

Morrow, Travis' mother wrote a letter to Morrow ostensibly, "to bring to [Morrow's] attention," an incident that she had already discussed with him ten days prior. This letter asserted that Travis was, "being forced to run during an asthma attack" and further stated, "I cannot and will not allow for my son to be put in a dangerous situation." The letter also asserted that Travis brought the matter up to Chase's attention ten days prior when, in fact, according to Fay's own diary, Morrow was allegedly approached first for the purpose of requesting that he speak to Chase. The Plaintiffs are of information and belief that the letter was orchestrated by Fay, who obviously knew or was involved in the situation according to her own diary.

54. On January 31, 1995, Chase was summoned to a meeting with Fay, Morrow and Baker. Baker's participation again was in contravention to Morrow's prior assurances to Chase and evidenced Morrow's tacit approval of Baker and Fay's actions against Chase. The purpose of such meeting was to discuss seven of Fay's latest charges, which included, *inter alia*, Chase leaving a shed door unlocked. During the meeting, Fay insisted that Morrow and Baker report Chase's conduct to county administrators.

55. On or about February 20, 1995, Morrow issued a "Directive Memo" to Chase indicating, *inter alia*, that Defendant Morrow, "found out [Chase] had received a Letter of Reprimand in 1988 for inappropriate conduct [and was] suspended in 1991 for inappropriately touching a student."

56. Chase's personnel file contained information regarding the 1988 reprimand for using the words "bonehead" and "meathead." Chase had not used these terms since 1988, when the terms were made popular by the television character Archie Bunker in the show

All In The Family.

57. On April 5, 1995, Chase received his Professional Performance Evaluation from Morrow. The evaluation stated, *inter alia*, that Chase "meets or exceeds" standards on all material categories.

58. Fay, at all relevant times maintained a secret teacher file on Chase in violation of Article XXXIII of the Agreement Between the School Board of Pinellas County and the Pinellas Classroom Teachers Association ("Agreement"). Furthermore, Fay in contravention to an express directive of Morrow, refused to relinquish such file to Chase.

59. Fay's campaign to destroy Chase and his family's livelihood directly violated the Principles of Professional Conduct for the Education Profession in Florida. Rule 6B-1.006(5), Florida Administrative Code (1999), expressly prohibits any teacher from: engaging in harassing or discriminatory conduct; creating a hostile, intimidating, abusive, offensive or oppressive environment; making malicious or intentionally false statements about a colleague; using coercive means to influence the professional judgments of colleagues; submitting fraudulent information on any document in connection with professional activities. Such rule also mandates revocation or suspension of the offender's educator's certificate or other penalties for violation of its provisions.

60. Notwithstanding the number and nature of Fay's false accusations, her admitted prohibited maintenance of a secret file on Chase and her unauthorized intrusion into Chase's school mail box, no one, including Baker, Morrow or Barker, ever disciplined or even reprimanded Fay. Baker, Morrow and Barker gave their tacit approval to, and, in fact, assisted Fay in her campaign to have Chase wrongfully terminated. Instead, Morrow

even warned Chase that he should "walk on egg shells" because Fay would "not let go" and has subsequently admitted under oath that he knew Fay's complaints were "unfair."

61. Neither Baker, Barker or Morrow, or any other School Board employee or Union representative ever questioned the student/students who were allegedly involved in any complained of episodes. Nor did Baker, Barker, Morrow or any other School Board employee or Union representative ever conduct any meaningful investigation of the allegations against Chase.

62. Though Defendant Fay obtained a school transfer for the 1995/1996 school year she nonetheless continued to orchestrate through others at Shady Lane Elementary School her campaign to have Chase wrongfully terminated.

63. On or about October 26, 1995, Morrow assertedly received a written complaint that Chase, two months prior, on September 5, 1995 was fifteen minutes late to a staff meeting and that a month prior on September 21, 1995, Chase was late for a Safety Committee meeting. Defendant Morrow also contends that he was advised by teacher Barrett, a close friend of Fay who also had a reputation of causing trouble, that Barrett asserted that she was "told" that Chase on two occasions left work early in October 1995. These allegations were never investigated nor was Chase provided an opportunity to respond. Barrett also complained of Chase allegedly "yelling, screaming and embarrassing students." Barrett did not provide and Morrow did not request any facts to support or corroborate such vague, non-specific allegations.

64. Thereafter, Morrow filed another complaint report against Chase with the Office of Professional Standards, alleging, *inter alia*, "performance deficiencies - arriving late,

leaving early-grabbing students." The wording was purposely vague, general and unspecific.

65. On December 7, 1995, a meeting was held to address the various unsubstantiated, un-investigated allegations levied against Chase since the fall of 1995. In attendance were Chase, Barker, Morrow and Moore.

66. Chase, not knowing of the alliance between Fay and Moore, requested Moore to attend the meeting and "defend" Chase as his PCTA representative. Moore never advised Chase that he, Moore, since August of 1994, had been, advising and assisting Fay in her goal to have Chase wrongfully terminated.

67. Subsequent to this meeting, Barker claimed to have reviewed Chase's "past history of problems with the District, including letters regarding inappropriate interactions with students as well as a suspension without pay for kicking a student." Barker thereafter issued another Letter of Reprimand which included such alleged prior conduct and a charge of "aggressive interaction" by Chase.

68. On or about January 24, 1996, despite Morrow's reprimand of Chase for alleged inappropriate "aggressive interaction," Morrow transferred a particularly disruptive student accused of committing battery upon two other students to Chase for his supervision. Such action evidences either the falsity of the charges lodged against Chase or that Morrow was attempting to set up Chase for termination through such student transfer.

69. On February 18, 1996, Chase submitted his application to teach summer school. Morrow approved the request and forwarded it to the School Board on February 28, 1996 asserting, *inter alia*, that Chase had, "shown skill" in motivating at risk students and that

Chase displayed excellent attendance.

70. Article XXIV, Section B of the Agreement dealing with summer school provides: "[i]n filling such positions, quality of performance, attendance record, experience, teaching background in the specific content area and seniority in the county school system shall be the criteria for selection."

71. On or about March 21, 1996, a letter of complaint composed by Dale Ebert, a teacher's assistant, was hand delivered to Barker. The letter alleged that Chase was using the words "bonehead" and "meathead." Ebert never specified dates, places or students involved. Rather, such allegations referred to the 1988 incident, which Ebert could have only learned of by having access to Chase's personnel file. Ebert also accused Chase of threatening to "beat the hell" out of "one or more children." Chase vehemently denied the accusation and despite Chase's requests, no investigation was conducted.

72. On March 26, 1996, a meeting was held between Morrow, George Jones and Chase. That same day, Jones issued a conference report to Barker and his Office of Professional Standards advising that Chase is "better suited as a high school physical education teacher and should be placed as such."

73. Unknown to Chase at the time, this report was thereafter fraudulently altered by deleting this recommendation and substituting in its place the following: "I [Defendant Jones] have grave concerns as to Mr. Chase's ability to perform his duties as a physical education teacher in the manner that is in the best interests of the children in Pinellas County Schools."

74. On March 27, 1996, Defendant Hinesley directed a letter to Chase which, *inter*

*alia*, placed him on administrative leave effective March 27, 1996 and prohibited him from entering school property, asserting that "this step being taken in order to facilitate the district's investigation of allegations made against you."

75. No such investigation was conducted.

76. On March 29, 1996, Morrow sent correspondence to Barker stating, *inter alia*, "as per our telephone conversation today, March 29, 1996, I recommend that Phil Chase, presently our Physical Education Teacher, be dismissed from the Pinellas County School System."

77. On April 1, 1996, Barker sent correspondence to Hinesley recommending Chase's termination. The memo referenced, *inter alia*, Chase's use of the terms bonehead and meathead ten years prior, stating that "the attached information is being submitted to you for your consideration and/or approval."

78. Barker's letter also represented that Morrow, Bill Williamson (Area One Superintendent) and School Board Attorney, Keith Martin supported Chase's termination.

79. Though Barker's letter recommended Chase's termination, it purportedly left the final decision up to Hinesley. This letter was assertedly received by Hinesley on April 3, 1996. Notwithstanding, Hinesley sent correspondence to Chase on April 1, 1996 which incorporated Barker's identical language contained in the letter which Hinesley would not receive until two days later.

80. Hinesley in his correspondence to Chase advised Chase that he was suspended with pay effective April 1, 1995 until April 22, 1995, the date of the next School Board meeting.

81. Hinesley further advised that if Chase sought a hearing on the matter that Chase would be suspended without pay until the hearing process culminated in a final decision.

82. Chase exercised his right to a hearing.

83. On or about April 10, 1996, the PCTA, of which Moore is Executive Director, hired attorney Mark Herdman for the purported purpose of defending Chase. In doing so, the PCTA, NEA, FTP, Moore and Herdman each failed to disclose that the Union and Mr. Herdman had a conflict of interest in providing adequate representation to Chase. Such conflict of interest resulted from, *inter alia*, the fact that the Union was closely affiliated with and secretly representing the interests of two principal accusers of Chase, both of whom were Union members who had for a period of two years maliciously engaged in a personal campaign to have Chase terminated from his employment. In addition, the Union, Moore and Herdman failed to disclose that Herdman's loyalties as the Union's attorney were to the Union and its officials, including Fay and Moore, and not to Chase. The Union, Moore and Hardman also failed to disclose that Herdman, because of the prospect of future financial gain, would place the Union's interests and the interests of Chase's principal accusers above those of Chase.

84. In a newspaper interview conduced on or about April 17, 1996, Barker paired Chase with another teacher accused of sexually molesting a student. Barker also disclosed all of the past and present charges of misconduct lodged against Chase.

85. On April 23, 1996, Barker sent correspondence to Chase advising him that the School Board had suspended Chase without pay effective April 24, 1996. As a result Chase and his family suffered severe economic hardship, including but not limited to loss

of Chase's health insurance.

86. Herdman represented Chase in the Administrative Hearing on October 29, 1996 and subsequent Second District Court of Appeals appearance which culminated in an opinion on December 17, 1977.

87. At all times Herdman's and the Union's purported representation of Chase was arbitrary, perfunctory, discriminatory and conducted in bad faith.

88. During the course of the Union and Herdman's purported representation of Chase, *inter alia*,:

A) Herdman and the Union knowingly failed to depose Fay, notwithstanding the fact she was the principal accuser of Chase and the author of over seventy-two (72) complaints concerning Chase;

B) The few depositions Herdman and the Union did take were perfunctory, lasting an average of 25 minutes per deposition. For example, the deposition of Baker, lasted all of 12 minutes and the deposition of George Jones, the Supervisor of Pinellas County Physical Education, who recommended in a formal report just days prior to the decision to terminate Chase, that he be transferred to a High School teaching position, and whose recommendation was subsequently fraudulently altered by the School Board's Administrative Office to a recommendation of Chase's termination, lasted 18 minutes;

C) Herdman and the Union knowingly failed to depose Moore, the PCTA Executive Director, regarding, *inter alia*, the conversation he had with Fay two years prior to Chase's wrongful termination in which Moore advised and agreed that the Union supported Fay's efforts to have Chase removed;

D) Herdman and the Union knowingly failed to enter into evidence relevant pages of Fay's diary which admitted to the conversation between her and Moore and his agreement that the Union would support Fay's efforts to have Chase terminated from his employment;

E) Herdman and the Union knowingly failed to disclose in the administrative hearing that Jones' report was fraudulently altered by the Pinellas County School Board so as to recommend Chase's termination;

F) Herdman and the Union knowingly failed to call various exculpatory witnesses;

G) Herdman and the Union knowingly failed to disclose the facts set forth herein to the Administrative Law Hearing Officer or to the Court of Appeal; and

H) Herdman and the Union failed to disclose to Chase substantial facts material to his defense, including but not limited to, the Union's and Moore's involvement in Fay's campaign to have Chase's employment wrongfully terminated, the fraudulent alteration of Jones' report, and that the Defendants' action constituted unfair labor practices which were actionable under §447.50, Fla. Stats. and subject to a statute of limitations period.

89. Attorney Keith Martin in addition to being a participant in the School Board's ultimate decision to terminate Chase, prosecuted Chase in the Administrative Hearing.

90. As a result of the foregoing bad faith representation of Chase by Herdman and the Union, Chase's termination was affirmed by the Administrative Hearing Officer and ultimately the Second District Court of Appeal.

91. As a result of the conduct of the Defendants, Chase lost his employment, and was unable to obtain similar employment.

92. Chase was thereafter diagnosed with terminal cancer.

93. As a result of the conduct of the Defendants, the Plaintiffs lost wages, lost their medical insurance coverage, was the subject of public ridicule and humiliation, lost their credit worthiness, lost their family home, lost consortium, loss of the ability to trust, Chase experienced an accelerated progression of his terminal illness, and suffered extreme emotional distress.

94. Chase died on May 29, 1998.

## COUNT I
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL AND/OR ADVANTAGEOUS BUSINESS RELATIONSHIP; CONSPIRACY

95. The allegations in paragraph 1 to 94 are realleged and incorporated as if set forth herein.

96. At all material times, Chase had a continuing employment contract and advantageous business relationship with the State of Florida, Public School System.

97. Defendants Fay, PCTA, FTP, NEA, Moore, Morrow, Barker, Baker, and Hinesley at all relevant times were aware of the existence of Chase's employment contract and advantageous business relationship with the State of Florida, Public School System.

98. At all relevant times it was known to Defendants Morrow, Moore, Fay, Barker, Baker, Hinesley and the Union that Gloria Chase was a third party beneficiary under Chase's employment contract, and it was at all relevant times foreseeable that Gloria Chase would be harmed by such Defendants' unjustified interference in Chase's employment contract.

99. Defendants Morrow, Moore, Barker, Baker, Hinesley and the Union at all times

acted in concert with and conspired with Fay to intentionally interfere in Chase's employment contract and advantageous business relationship with the State of Florida, Public School System.

100. Defendants Fay, PCTA, FTP, NEA, Moore, Morrow, Barker, Baker, and Hinesley directly and intentionally interfered with Chase's employment contract and advantageous business relationship with the State of Florida, Public School System.

101. Defendants Fay, Morrow, Moore, Barker, Baker, Hinesley and the Union for improper motives, unrelated to Chase's skills, competence or qualifications to be a teacher employed by the State of Florida, Public Schools System, intentionally caused and induced the State of Florida, Public School System to wrongfully terminate Chase, thereby, intentionally interfering in Chase's employment contract and advantageous business relationship.

102. But for such Defendants' unjustified and intentional interference, Chase would have continued to be employed by the State of Florida, Public School System and he and his family would have continued to reap the benefits under such contract and advantageous business relationship.

103. Such Defendants intentionally interfered with Chase's contract and advantageous business relationship with the State of Florida Public School System for the unjustified purpose of harming Chase.

104. The acts of Defendants Fay, Morrow, Baker, Barker and Hinesley were committed with intent, in bad faith, in a manner exhibiting willful and wanton disregard for human rights, safety or property and with malicious purpose.

105. As a direct and proximate result of Defendants' Fay, PCTA, FTP, NEA, Moore, Morrow, Barker, Baker and Hinesley, the Plaintiffs suffered damages including, but not limited to, extreme emotional distress, loss of employment, loss of wages, loss of medical insurance, loss of the family home, mental anguish, accelerated progression of Chase's terminal illness, public humiliation, ridicule, destruction of reputation and loss of consortium.

WHEREFORE, the Plaintiffs request this Court to enter judgment in favor of the Plaintiffs and against Defendants Fay, Morrow, Barker, Baker, Moore, PCTA, FTP, NEA and Hinesley for damages, costs and other such relief as this Court deems appropriate.

## COUNT II
## INFLICTION OF SEVERE EMOTIONAL DISTRESS; CONSPIRACY

106. The allegations in paragraph 1 to 94 are realleged and incorporated as if set forth herein.

107. Defendant Fay, with the knowledge and assistance of Defendants PCTA, NEA, FTP, Moore, Morrow, Barker, Baker and Hinesley, engaged in a continuous course of conduct over a two year period that was intended to directly interfere with and destroy Chase's professional career and Chase and his family's livelihood.

108. Defendants Morrow, Barker, Hinesley, Baker, PCTA, FTP, NEA and Moore at all relevant times acted in concert and conspired with Fay to effectuate such intended result.

109. The Defendants Fay, PCTA, FTP, NEA, Moore, Morrow, Barker, Baker and Hinesley, through their actions, destroyed Chase's career and livelihood, causing the

Plaintiffs to, *inter alia*, lose their health insurance, became delinquent in credit card payments and mortgage payments, liquidate their and their children's savings, sell their vehicles and other assets in order to meet ordinary household expenses, lose the consortium of other, and lose their family home.

110. As a further result of the Defendants' actions: (1) Chase suffered an accelerated progression of his terminal illness, (2) the Plaintiffs' remaining time together was spent liquidating family assets in an effort to meet ordinary household expenses and attempting to address dunning creditors, (3) Chase' emotional trauma resulting from his imminent death was further exacerbated by the knowledge that as a result of the Defendants' actions he was leaving his family in substantial debt with no savings, and without any family home, and (4) Gloria Chase's emotional trauma resulting from Chase's death, was exacerbated by the knowledge that as a result of the Defendants' actions, she and her children had lost their family home and savings, were liable for substantial debt that would have otherwise been covered by insurance and were unable to meet normal household expenses.

111. The conduct of the Defendants was extreme and outrageous. Such Defendants' actions were beyond all bounds of decency and can be regarded as nothing less than atrocious and utterly intolerable to a civilized society.

112. The Defendants at all relevant times acted with intent or in reckless disregard of the extreme emotional distress that would be inflicted upon the Plaintiffs.

113. The actions of Defendants Fay, Morrow, Barker, Baker and Hinesley were committed in bad faith or in a manner exhibiting willful and wanton disregard for human

rights, safety or property and with malicious purpose.

114. As a direct and proximate result of the actions of Defendants Fay, Morrow, Barker, Baker, Hinesley, Moore, NEA, FTP and PCTA, the Plaintiffs suffered damages, including but not limited to, extreme emotional distress, loss of employment, loss of credit worthiness, loss of wages, loss of the family home, loss of health insurance, mental anguish, accelerated progression of Chase's terminal illness, public humiliation, ridicule, destruction of reputation and loss of consortium.

WHEREFORE, Plaintiffs request this Court to enter judgment in favor of Plaintiffs and against Defendants Fay, Morrow, Hinesley, Barker, Baker, NEA, FTP, Moore and PCTA for damages, costs, and other such relief as this Court deems appropriate.

**COUNT III**
**INFLICTION OF**
**SEVERE EMOTIONAL DISTRESS: SCHOOL BOARD**

115. The allegations in paragraphs 1 to 94 and 109 to 110 are realleged and incorporated as if set forth herein.

116. At all relevant times Defendants Fay, Morrow, Baker, Barker and Hinesley were acting in the course and scope of their employment with the Pinellas County School Board.

117. The acts of Defendants Fay, Morrow, Baker, Barker and Hinesley were not committed in bad faith, not in a manner exhibiting willful and wanton disregard for human rights, safety or property and not with malicious purpose.

118. Defendants Morrow, Barker, Hinesley, Baker, PCTA, FTP, NEA and Moore at all relevant times conspired with and acted in concert with Fay to effectuate Chase's wrongful termination.

119. The conduct of such Defendants was extreme and outrageous in that their actions were beyond all bounds of decency and can be regarded as nothing less than atrocious and utterly intolerable to a civilized society.

120. Defendants Fay, Morrow, Baker, Barker, and Hinesley at all relevant times acted intentionally or in reckless disregard of the extreme emotional distress that would be inflicted on the Plaintiffs.

121. Defendant Pinellas County School Board through the actions of its agent and/or employees inflicted severe emotional distress upon the Plaintiffs.

122. As a direct and proximate result of Defendant School Board's acts and omissions the Plaintiffs suffered damages including, but not limited to, extreme emotional distress, loss of employment, loss of the family home, loss of wages, loss of credit worthiness, loss of health insurance, mental anguish, accelerated progression of Chase's terminal illness, public humiliation, ridicule, destruction of reputation and loss of consortium.

WHEREFORE, the Plaintiffs request this Court to enter judgment in favor of the Plaintiffs and against the Defendant Pinellas County School Board for damages, costs and other such relief as this Court deems appropriate.

**COUNT IV**
**NEGLIGENT RETENTION AND SUPERVISION**

123. The allegations in paragraphs 1 to 94 are realleged as incorporated as if set forth herein.

124. Defendants Morrow, Hinesley, Barker and Baker at all relevant times, each had a duty to supervise their employees and/or subordinates so as to insure that such persons

would not cause harm to others, including the Plaintiffs, during the course and scope of such employee's employment.

125. Defendants Morrow, Barker, Hinesely and Baker at all relevant times knew or should have known that Fay would cause harm to the Plaintiffs if they did not take the necessary corrective disciplinary actions to cause Fay to cease in her efforts to have Chase wrongfully terminated through, *inter alia*, her repeated violations of Rule 6B-1.006(5) Florida Administrative Code and other improper conduct.

126. Defendants Morrow, Barker, Baker and Hinesley owed a duty to the Plaintiffs to protect them from harm resulting from Fay's repeated violations of Rule 6B-1.006(5), Florida Administrative Code, and other misconduct that was purposely intended to harass and otherwise injure the Plaintiffs.

127. Defendants Morrow, Barker, Baker and Hinesley, at all relevant times, knew or should have known that Fay's allegations of misconduct were false and intended for the improper purpose of having Chase wrongfully terminated or otherwise harming the Plaintiffs.

128. Defendants Morrow, Barker, Baker and Hinesley's failure to take any action whatsoever to protect the Plaintiffs from the ongoing campaign by Fay to have Chase wrongfully terminated breached such Defendant's duty to the Plaintiffs.

129. Defendants Morrow, Barker, Baker and Hinesley's failure to conduct any type of meaningful investigation of the numerous false allegations of misconduct levied against Chase breached the Defendants' duty to the Plaintiffs.

130. Defendants Morrow, Barker, Baker and Hinesley's acts and omissions, in fact,

fostered, promoted and incited additional wrongful conduct by Fay which was intended to procure the wrongful termination of Chase or otherwise harm the Plaintiffs.

131. The acts of Defendants Morrow, Baker, Barker and Hinesley were not committed in bad faith, not in a manner exhibiting willful and wanton disregard for human rights, safety or property and not with malicious purpose.

132. As a direct and proximate result of such Defendants' aforementioned breach of their duty to the Plaintiffs, the Plaintiffs suffered damages, including but not limited to, extreme emotional distress, loss of employment, loss of the family home, loss of wages, loss of credit worthiness, mental anguish, loss of health insurance, accelerated progression of Chase's terminal illness, public humiliation, ridicule, destruction of reputation, and loss of consortium.

133. At all relevant times Defendants Morrow, Baker, Barker and Hinesley were acting in the course and scope of their employment with the Pinellas County School Board.

134. Defendant Pinellas County School Board through the acts and omissions of its agents and/or employees negligently retained and supervised its employees, including but not limited to Fay, resulting in injury to the Plaintiffs.

WHEREFORE, the Plaintiffs request this Court enter a judgment in favor of the Plaintiffs and against Defendants Pinellas County School Board for damages, costs, and such relief as this Court deems appropriate.

**COUNT VI**
**BREACH OF DUTY OF FAIR REPRESENTATION: UNION**

135. The allegations in paragraph 1 to 94 are realleged and incorporated as if fully set

forth herein.

136. The Plaintiff at all material times was a member of the PCTA, FTP and NEA.

137. The PCTA, FTP and NEA, collectively were the exclusive bargaining representative of Chase by virtue of Chase's union membership.

138. The Union as the exclusive bargaining representative of Chase owed a duty of fair representation to Chase.

139. The Union's purported representation of Chase in relation to the defense of allegations of misconduct levied against him was pretextual, perfunctory, arbitrary, discriminatory and conducted in bad faith.

140. The Union's purported representation of Chase was either purposely designed and intended to deprive Chase of substantial legal and property rights or was the result of recklessness on the part of the Union.

141. The Union's acts and omissions caused Chase to be denied certain rights enumerated under the collective bargaining agreement between PCTA and the School Board and Florida law, to which Chase was entitled.

142. It was at all times reasonably foreseeable that the Union's breach of its duty of fair representation to Chase would cause harm to Gloria Chase.

143. As a direct and proximate result of the Union's breach of its fiduciary duty to Chase, the Plaintiffs suffered damages, including but not limited to, extreme emotional distress, loss of employment, loss of wages, loss of family home, loss of health insurance, loss of credit worthiness, mental anguish, accelerated progression of Chase's terminal illness, public humiliation, ridicule, destruction of reputation, and wife's loss of

consortium.

WHEREFORE, the Plaintiffs requests this Court to enter judgment in favor of Plaintiffs and against Defendants Moore, PCTA, FTP and NEA for damages, costs and other such relief as this Court deems appropriate.

**COUNT VII**
**BREACH OF FIDUCIARY DUTY: UNION**

144. The allegations in paragraph 1 to 94 are realleged and incorporated as if set forth herein.

145. The PCTA, FTP and NEA (hereinafter referred to collectively as "the Union") at all relevant times held themselves out to the Plaintiffs as being a labor union for teachers, the function and purpose of which was to at all times act in the best interests and welfare of Chase through its representation of Chase in the collective bargaining process, all grievance proceedings, all disciplinary proceedings and all matters relating Chase's employment.

146. Such representations were intended to result in Chase's reliance upon and confidence in the Union, to which he paid monthly dues.

147. As a result of such representations, the Union was a repository of Chase's trust and confidence and exerted influence over Chase.

148. The FTP, NEA and PCTA breached their fiduciary duty to Plaintiff by, *inter alia*:

a. Failing to disclose that Chase's Union Representative and Union Executive Director were acting in concert to have Chase wrongfully terminated;

b. Failing to protect the rights of Chase and advance Chase's interests over the

two years proceeding his suspension;

c. Failing to promote and protect Chases's rights during both the Administrative and Appellate proceedings;

d. Failing to make any efforts to prevent Defendant Fay and her co-conspirators from carrying on their two year campaign to have Chase wrongfully terminated;

e. Failing to conduct any meaningful investigation of the charges against Chase;

f. Failing to disclose to Chase Herman's and the Union's conflict of interest; and

g. Failing to disclose to Chase substantial facts material to his defense, including but not limited to, the Union's and Moore's involvement in Fay's campaign to have Chase's employment wrongfully terminated, the fraudulent alteration of Jones' report, and that the Defendants' actions constituted unfair labor practices which were actionable under §447.50, Fla. Stats.

149. It was at all times reasonably foreseeable that the Union's breach of its fiduciary duty to Chase would cause harm to Gloria Chase.

150. As a direct and proximate result of the Union's breach of its fiduciary duty to Chase, the Plaintiffs suffered damages, including but not limited to, extreme emotional distress, loss of employment, loss of wages, loss of family home, loss of health insurance, loss of credit worthiness, mental anguish, accelerated progression of Chase's terminal

illness, public humiliation, ridicule, destruction of reputation, and wife's loss of consortium.

WHEREFORE, Plaintiffs request this Court to enter judgment in favor of Plaintiffs and against Defendant PCTA, FTP and NEA for damages, costs, and other such relief as this Court deems appropriate.

## COUNT VIII
## FRAUD; CONSPIRACY

151. The allegations in paragraph 1 to 94 are realleged and incorporated as if set forth herein.

152. The PCTA, FTA and NEA (hereinafter referred to collectively as "the Union") at all relevant times held themselves out to the Plaintiffs as being a labor union for teachers, the function and purpose of which was to at all times act in the best interests and welfare of Chase through its representation of Chase in the collective bargaining process, all grievance proceedings, all disciplinary proceedings and all matters relating Chase's employment.

153. Such representations of fact were intended to result in the Plaintiff's reliance upon and confidence in the Union and to entice his payment of Union dues.

154. Such representations of fact were known to be false when they were made.

155. In reliance on such false representations of fact the Plaintiffs paid and continued to pay his Union dues throughout the course of his employment.

156. The Union and Moore at no time disclosed to the Plaintiffs that it and its agents, particularly Moore, were actively involved and conspiring with and assisting Fay in her

campaign to have Chase's professional reputation ruined and Chase wrongfully terminated.

157. Disclosure of this material fact was not made for the intended purpose of enticing the Plaintiffs to continue paying the Union dues, which they, in fact, did.

158. As a direct and proximate result of the aforementioned fraudulent representation and omissions, the Plaintiffs suffered damages including, but not limited to, loss of Union dues, extreme emotional distress, loss of employment, loss of wages, loss of family home, loss of health insurance, loss of credit worthiness, mental anguish, pain and suffering, public humiliation, ridicule, destruction of reputation, and wife's loss of consortium.

WHEREFORE, Plaintiffs request this Court to enter judgment in favor of Plaintiffs and against Defendants PCTA, FTP, NEA, and Moore for damages, costs, and other such relief as this Court deems appropriate.

**COUNT IX**
**NEGLIGENT MISREPRESENTATION/NON-DISCLOSURE**

159. The allegations in paragraph 1 to 94 are realleged and incorporated as if set forth herein.

160. The PCTA, FTP and NEA (hereinafter referred to collectively as "the Union") at all relevant times held themselves out to the Plaintiffs as being a labor union for teachers, the function and purpose of which was to at all times act in the best interests and welfare of Chase through its representation of Chase in the collective bargaining process, all grievance proceedings, all disciplinary proceedings and all matters relating Chase's employment.

161. Such representations of fact were intended to result in the Plaintiffs' reliance upon

and confidence in the Union and to entice their payment of Union dues.

162. Defendants PCTA, FTP, and NEA knew or should have known at the time such representations were made that they were in fact false.

163. In reliance on such false representations of fact, the Plaintiffs paid Chase's Union dues throughout the course of his employment.

164. The Union and Moore at no time disclosed to the Plaintiffs that the Union and its agents, particularly Moore, were actively involved and conspiring with and assisting Fay in her campaign to have Chase wrongfully terminated.

165. At the time of such non-disclosure, the FTP, NEA, PCTA and Moore knew or should have known that such fact was material to Plaintiffs' decision to continue payment of Union dues and that they had a duty to disclose such information.

166. As a direct and proximate result of the aforementioned fraudulent representation and omissions, the Plaintiffs suffered damages including, but not limited to, loss of Union dues, extreme emotional distress, loss of employment, loss of wages, loss of family home, loss of health insurance, loss of credit worthiness, mental anguish, pain and suffering, public humiliation, ridicule, destruction of reputation, and wife's loss of consortium.

WHEREFORE, Plaintiffs request this Court to enter judgment in favor of Plaintiffs and against Defendants PCTA, FTP, NEA and Moore for damages, costs, and other such relief as this Court deems appropriate.

**COUNT X**
**BREACH OF FIDUCIARY DUTY: FAY**

167. The allegations in paragraph 1 to 94 are realleged and incorporated as if set forth

fully herein.

168. The PCTA, FTA and NEA (hereinafter referred to collectively as "the Union") at all relevant times held themselves out to the Plaintiffs as being a labor union for teachers, the function and purpose of which was to at all times act in the best interests and welfare of Chase through its representation of Chase in the collective bargaining process, all grievance proceedings, all disciplinary proceedings and all matters relating to Chase's employment.

169. Defendant Fay was, at all material times, the Faculty Union Representative from Sandy Lane Elementary School.

170. As Faculty Union Representative of Sandy Lane Elementary School, Fay had the duty to not levy or cause to be levied false allegations of misconduct concerning union members teaching in Sandy Lane Elementary, including Chase.

171. As Faculty Union representative of Sandy Lane Elementary School, Fay had the duty to ensure that union members teaching in Sandy Lane Elementary were not disciplined or terminated for improper reasons unrelated to job performance.

172. As Faculty Union Representative of Sandy Lane Elementary School, Fay was a repository of trust and confidence of union members teaching at Sandy Lane Elementary.

173. Defendant Fay as Faculty Union Representative had a fiduciary duty to protect the rights of Chase and advance Chase's interest and welfare.

174. Defendant Fay breached her duties to Chase by, *inter alia*, her conduct described in this complaint.

175. It was at all times reasonably foreseeable that Fay's breach of her fiduciary duty

to Chase would cause harm to Gloria Chase.

176. As a direct and proximate result of Defendant Fay's breach of her fiduciary duty to Chase as PCTA representative, the Plaintiffs suffered damages including, but not limited to, extreme emotional distress, loss of employment, loss of wages, loss of health insurance, loss of credit worthiness, loss of family home, mental anguish, public humiliation, pain and suffering, ridicule, destruction of reputation and his wife's loss of consortium.

WHEREFORE, Plaintiffs request this Court to enter judgment in favor Plaintiffs and against Defendant Fay for damages, costs and other such relief as this Court deems appropriate.

**COUNT XI**
**BREACH OF FIDUCIARY DUTY / MOORE**

177. The allegations in paragraphs 1 to 94 are realleged and incorporated as if set forth herein.

178. The PCTA, FTA and NEA (hereinafter referred to collectively as "the Union") at all relevant times held themselves out to the Plaintiffs as being a labor union for teachers, the function and purpose of which was to at all times act in the best interests and welfare of Chase through its representation of Chase in the collective bargaining process, all grievance proceedings, all disciplinary proceedings and all matters relating to Chase's employment.

179. Defendant Moore, at all material times was the Executive Director of the PCTA

180. Moore at all relevant times knew and intended that by virtue of his position as

Executive Director of PCTA that he was a repository of the Plaintiffs' trust and confidence.

181. As Executive Director of the PCTA, Moore had the duty to not levy or cause to be levied false allegations of misconduct concerning Union members, including Chase.

182. As Executive Director of the PCTA, Moore had the duty to ensure that union members, including Chase, were not disciplined or terminated for improper reasons unrelated to job performance.

183. As Executive Director of the PCTA, Moore was a repository of trust and confidence of union members, including Chase.

184. Defendant Moore had a fiduciary duty to, *inter alia*, 1) provide Chase the utmost loyalty, 2) advance Chase's interests and welfare, 3) promote and protect Chase's rights, 4) assist Chase in the investigation of allegations that formed the asserted basis for disciplinary actions, and 5) give Chase full disclosure of all material facts

185. Defendant Moore breached his fiduciary duties to Chase by, *inter alia*, (a) collaborating with and assisting Fay in her campaign to have Chase wrongfully terminated, (b) failing to disclose to Chase, *inter alia*, his ongoing collaboration with Defendant Fay to have Chase wrongfully terminated; (c) failing to investigate or ensure other appropriate officials investigated the various false allegations against Chase; (d) taking no action to expose, prevent or deter the improper conduct of Defendant Fay, Barker and Baker against Chase; (e) empowering and fostering Fay, Baker and Barker to continue in their efforts to have Chase terminated for improper reasons unrelated to job performance; and (f) failing to disclose the Union's and Herdman's conflict of interest.

186. It was at all times reasonably foreseeable that Moore's breach of his fiduciary duty to Chase would cause harm to Gloria Chase.

187. As a direct and proximate result of Moore's breach of his fiduciary duty to Chase, the Plaintiffs suffered damages, including but not limited to, extreme emotional distress, loss of employment, loss of wages, loss of family home, loss of health insurance, loss of credit worthiness, mental anguish, accelerated progression of Chase's terminal illness, public humiliation, ridicule, destruction of reputation, and wife's loss of consortium.

WHEREFORE, Plaintiffs request this Court to enter judgment in favor of Plaintiffs and against Defendant Moore for damages, costs and such relief as this Court deems appropriate

**COUNT XII**
**FRAUD / DECEPTION: BARKER; CONSPIRACY**

188. The allegations in paragraph 1 to 94 are realleged and incorporated as if set forth herein.

189. On or about March 26, 1996 a conference was held at Sandy Lane Elementary School between Principal Morrow, School Physical Education Supervisor Jones and Chase.

190. As a result of said conference, Supervisor Jones wrote a memorandum which included, *inter alia*, the recommendation that Chase would be, "better suited as a high school physical education teacher and should be placed as such."

191. On information and belief, the memorandum was received by Defendant Barker at the Office of Professional Standards on March 28, 1996.

192. On information and belief, Defendant Barker, pursuant to and in furtherance of Fay and his co-conspirators' scheme to have Chase's professional reputation ruined and Chase wrongfully terminated, subsequently fraudulently altered, or caused to be fraudulently altered, Jones' report by deleting such recommendation and substituting in its place the false assertion that Jones had "grave concerns" about Chase's ability to teach altogether.

193. Defendant Barker's alteration of the recommendation constituted a false representation of material fact.

194. Defendant Barker made this representation with the intent that third persons, including but not limited to the Plaintiffs, would rely on such false assertion.

195. As intended, such third person's reasonably and actually relied upon such false statement of fact to the Plaintiff's detriment.

196. The Plaintiffs incurred foreseeable damages resulting from such reliance.

197. Plaintiff is of information and belief that Defendants PCTA, PTA, NEA, Baker, Fay, Hinesley, Morrow and Moore at all relevant times knew and concealed from Chase and other third persons that Jones' report was fraudulently altered.

198. Defendant Barker's fraudulent alteration of the recommendation was intentional, made in bad faith, and in a manner exhibiting willful and wanton disregard for human rights, safety or property and with malicious intent.

199. At all relevant times Defendants Baker, Fay, Hinesley and Morrow acted intentionally, in bad faith, in a manner exhibiting willful and wanton disregard for human rights, safety or property and with malicious intent.

200. As a direct and proximate result of Defendant Barker's wrongful conduct, the

Plaintiffs suffered damages including, but not limited to, extreme emotional distress, loss of employment, loss of wages, mental anguish, loss of health insurance, loss of credit worthiness, loss of the family home, accelerated progression of Chase's terminal illness, public humiliation, ridicule, destruction of reputation and loss of consortium.

WHEREFORE, Plaintiffs request this Court to enter judgment in favor of Plaintiffs and against Defendants Barker, Baker, Fay, Morrow, Moore, Hinesley, PCTA, FTP and NEA for damages, costs and other such relief as this Court deems appropriate.

## COUNT XIII
## FRAUD / DECEPTION: SCHOOL BOARD

201. The allegations in paragraphs 1 to 94, and 189-197 are realleged and incorporated as if set forth herein.

202. At all relevant times Barker was acting in the course and scope of his employment with the Pinellas County School Board.

203. The acts of Barker, Baker, Hinesley and Morrow were not made in bad faith, not in a manner exhibiting willful and wanton disregard for human rights, safety or property and without malicious purpose.

204. Defendant Pinellas County School Board through the acts and omissions of its agents and/or employees committed the wrongful acts of fraud and deceit resulting in injury to the Plaintiffs.

205. As a direct and proximate result of Defendant Pinellas County School Board's acts or omissions the Plaintiffs suffered damages including, but not limited to, loss of employment, loss of wages, loss of health insurance, loss of credit worthiness, loss of

IN THE CIRCUIT COURT IN AND FOR PINELLAS COUNTY, FLORIDA
PROBATE DIVISION

IN RE: ESTATE OF

PHILIP J. CHASE, a/k/a,
PHILIP JAMES CHASE, II
Deceased.

Case #: 98-3365-ES

FILED
ST. PETERSBURG BRANCH
98 JUN 19 PM 2:0
KARLEEN F. DE BLAKER
CLERK CIRCUIT COURT

LETTERS OF ADMINISTRATION

TO WHOM IT MAY CONCERN:

WHEREAS, PHILIP J. CHASE died on May 29, 1998, at Clearwater, Pinellas County, Florida and, at the time of death, decedent was domiciled in Pinellas County, Florida and owned assets in the State of Florida, and

WHEREAS, GLORIA G. CHASE, has been appointed personal representatives of the estate of the decedent and has performed all acts prerequisite to issuance of letters of administration in the estate,

NOW THEREFORE I, the undersigned Circuit Judge, declare GLORIA G. CHASE to be duly qualified under the laws of the State of Florida to act as personal representative of the estate of PHILIP J. CHASE, deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will permit and the law directs; and to make distribution of the estate according to law.

ORDERED this 17 day of June, 1998 at St. Petersburg, Pinellas County, Florida.

Bruce Boyer

CIRCUIT JUDGE

CIRCUIT COURT ★ PINELLAS COUNTY ★ FLORIDA

STATE OF FLORIDA, PINELLAS COU
I hereby certify that the foregoing is a
photostatic copy as the same appears
among the files and records of this cou
and the same is in full force and effect
This JUN 23 1998 day
KARLEEN F. De BLAKER
Clerk of Circuit Court
By [signature]
Deputy Clerk

EXHIBI
A

ALL-STATE LEGAL